# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on November 1, 2013**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| | : | **Grand Jury Original** |
| | : | |
| v. | : | **VIOLATIONS:** |
| | : | |
| **MAHAN AIR,** | : | **18 U.S.C. § 371** |
| **HAMID ARABNEJAD,** | : | **(Conspiracy)** |
| **GHOLAM REZA MAHMOUDI,** | : | |
| and **ALI MOATTAR,** | : | **50 U.S.C. § 1705** |
| | : | **(International Emergency Economic** |
| Defendants. | : | **Powers Act)** |
| | : | |
| | : | **31 C.F.R. Part 560** |
| | : | **(Iranian Transactions and Sanctions** |
| | : | **Regulations)** |
| | : | |
| | : | **15 C.F.R. Part 764** |
| | : | **(Export Administration Regulations)** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting and Causing an Act** |
| | : | **to Be Done)** |
| | : | |
| | : | **18 U.S.C. § 981(a)(1)(c)** |
| | : | **28 U.S.C. § 2461(c)** |
| | : | **(Criminal Forfeiture)** |

## **INDICTMENT**

The Grand Jury charges that:

## **COUNT ONE**
### (Conspiracy to Unlawfully Export U.S.-Origin Goods to Iran and to Defraud the United States)

At all times material to this Indictment:

1. Defendant **MAHAN AIR** was a private Iranian passenger airline located in Tehran, Iran, and organized under the laws of Iran.

2. Defendant **HAMID ARABNEJAD ("ARABNEJAD")**, an Iranian national, was defendant **MAHAN AIR's** Managing Director.

3. Defendant **GHOLAM REZA MAHMOUDI ("MAHMOUDI")**, an Iranian national, was the Vice President of Business Development for defendant **MAHAN AIR**.

4. Defendant **ALI MOATTAR ("MOATTAR")**, an Iranian national, was the Consultant to the Managing Director of defendant **MAHAN AIR**.

5. Boeing 747 aircraft, Manufacturer Serial Numbers ("MSNs") 24363, 24383, 26879, 26474, 25395 and 26881 (respectively, "Boeing Aircraft 1," "Boeing Aircraft 2," "Boeing Aircraft 3," "Boeing Aircraft 4," "Boeing Aircraft 5," and "Boeing Aircraft 6"), were previously operated by United Airlines but sold during its Chapter 11 bankruptcy proceeding.

6. Balli Aviation Ltd ("Balli Aviation") was a British corporation with its principal place of business in London, England, and engaged in the business of aircraft sales, leases, and charters.

7. Balli Aviation acted, at times, through the following subsidiaries: Blue Sky One Ltd, a British corporation; Blue Sky Two Ltd, a British corporation; and Blue Sky Three Ltd, a British corporation.

   a) Blue Sky One Ltd ("BS1") was a subsidiary of Balli Aviation and a British corporation that owned Boeing Aircraft 1.

   b) Blue Sky Two Ltd ("BS2") was a subsidiary of Balli Aviation and a British corporation that owned Boeing Aircraft 2.

      c) Blue Sky Three Ltd ("BS3") was a subsidiary of Balli Aviation and a British corporation that owned Boeing Aircraft 3. [1]

8. Blue Airways was a passenger airline organized under the laws of Armenia, created and controlled by defendant **MAHAN AIR**.

9. Blue Sky Aviation FZE was a privately-held company organized under the laws of the United Arab Emirates, created and controlled by defendant **MAHAN AIR**.

10. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the U.S. when the President declared a national emergency with respect to that threat. Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

11. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

12. On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the U.S. or by a U.S. person. The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to

---

[1] BS1, BS2, and BS3, collectively, shall be referred to as the "BLUE SKY COMPANIES."

carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), implementing the sanctions imposed by the Executive Orders. In October 2012, the Department of the Treasury revised and renamed the ITR as the Iranian Transactions and Sanctions Regulations.

13. The ITR generally prohibited any person from exporting or causing to be exported from the United States any goods or technology without having first obtained an export license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which was located in the District of Columbia. The ITR were in effect at all times relevant to this Indictment. The ITR imposed, among others, the following prohibitions:

> Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:
>
> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.
>
> Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, or Services to Iran or the Iranian Government:
>
> Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> (a) Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . .
>
> Section 560.205 – Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons;
>
> Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United

States person is prohibited if:

(1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

(2) The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

14. The United States Department of Commerce, located in the District of Columbia, was responsible for reviewing and controlling the export of certain goods and technologies from the United States to foreign countries. The Export Administration Act ("EAA"), 50 U.S.C. App. §§ 2401-2420, authorized the Department of Commerce to prohibit or curtail the export of any goods and technology, as necessary, to protect, among other things, the national security and foreign policy of the United States. The Department of Commerce implemented that authority through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774. Although the EAA had lapsed, the EAR continued to be in effect under the provisions of the IEEPA, 50 U.S.C. §§ 1701-1706, by virtue of Executive Order 13222 (August 17, 2001), as extended by successive Presidential notices.

15. Part 746 of the EAR contained or referenced all of the BIS licensing requirements, licensing policies, and licensing exceptions for countries that are subject to a general embargo or other special controls by the United States, including Iran. Part 746.7 provided that: "No person may export or reexport any item that is subject to the EAR if such transaction is prohibited by the Iranian Transactions Regulations (31 CFR part 560) and not authorized by OFAC."

16.     The goods at issue in this case were subject to the EAR, 15 C.F.R. Part 734.3(a) and (c), and also the ITR.  Therefore, an OFAC license was required for their export or reexport to Iran.

17.     At no time relevant to this Indictment, did defendants or any co-conspirators, apply for receive, or possess a license from OFAC to export goods, technology, or services of any kind to Iran.  On or about March 17, 2008, pursuant to Part 766.24 of the EAR, the United States Department of Commerce issued to defendant **MAHAN AIR** a Temporary Denial Order ("TDO").  A copy of the TDO was delivered to defendant **MAHAN AIR** and was also published in the Federal Register.  The TDO prohibited, among other things:

> Carrying on negotiations concerning or ordering, buying, receiving, using, selling, delivering, storing, disposing of, forwarding, transporting, financing, or otherwise serving in any way, any transaction involving any item exported or to be exported from the United States that is subject to the EAR, or in any other activity subject to the EAR.

18.     Part 736.2(b)(4)(i) of the EAR prohibited the willful violation of a denial order, temporary or permanent, issued by the United States Department of Commerce:

> You may not take any action that is prohibited by a denial order issued under part 766 of the EAR, Administrative Enforcement Proceedings. These orders prohibit many actions in addition to direct exports by the person denied export privileges, including some transfers within a single country, either in the United States or abroad, by other persons. You are responsible for ensuring that any of your transactions in which a person who is denied export privileges is involved do not violate the terms of the order. Orders denying export privileges are published in the Federal Register when they are issued and are the legally controlling documents in accordance with their terms. [BIS] also maintains compilations of persons denied export privileges on its Web site at *http://www.bis.doc.gov*. [BIS] may, on an

            exceptional basis, authorize activity otherwise prohibited by a denial order. 15 C.F.R. Part 764.3(a)(2).

19. The conduct alleged in this Count began outside of the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and is therefore within the venue of the United States District Court for the District of Columbia, as provided by 18 U.S.C. §§ 3237(a) and 3238.

## The Conspiracy

20. Beginning in or around 2006 through in or around October 2008, within the District of Columbia and elsewhere, defendants **MAHAN AIR**, **ARABNEJAD, MAHMOUDI, MOATTAR,** and others known and unknown to the Grand Jury, conspired to: (a) commit an offense against the United States, that is, to export and cause the exportation of goods from the United States to Iran, that is Boeing Aircrafts One through Six, in violation of the prohibitions imposed upon that country by the United States Government, without having first obtained the required licenses from OFAC, located in the District of Columbia, in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Parts 560.203, 560.204, and 560.205; and (b) defraud the United States Government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods from the United States to Iran without having first obtained the required licenses from OFAC, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

## Objects of the Conspiracy

21. The objects of the conspiracy were:

    A. to acquire U.S.-origin goods, that is, U.S.-origin Boeing 747s to supply to entities and end-users in Iran;

  B. to conceal from United States companies and the United States government that the U.S.-origin goods were destined for Iranian end-users;

  C. to make a financial profit for defendants and other conspirators;

  D. to evade the regulations, prohibitions, and licensing requirements of the EAR and the ITR.

  E. to violate a denial order issued by the United States Department of Commerce, located in the District of Columbia.

## Manner and Means of the Conspiracy

21. The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

  a. Defendants and other conspirators acted inside and outside of the United States to acquire U.S.-origin aircraft.

  b. Defendants and other conspirators provided financing to purchase U.S.-origin aircraft.

  c. Defendants and other conspirators caused U.S.-origin aircraft to be exported from the United States to Iran without obtaining a license or other authorization from OFAC, or the United States Department of Commerce, Bureau of Industry and Security.

  d. Defendants and other conspirators caused the entering of lease arrangements that permitted them to utilize and continue to utilize U.S.-origin aircraft for flights in and out of Iran.

  e. Defendants and other conspirators executed false Bills of Sale in an attempt to take title to U.S.-origin aircraft.

    f.    Defendants and other conspirators entered into prohibited negotiations concerning the ownership of U.S.-origin aircraft subject to a TDO.

### Overt Acts

22.    In furtherance of this conspiracy, and to accomplish its purposes and objects, at least one of the conspirators committed or caused to be committed, at least one of the following overt acts, among others:

    a.    Beginning in or around January 2006, defendants **ARABNEJAD, MAHMOUDI** and **MOATTAR,** on behalf of defendant **MAHAN AIR**, met with Balli Aviation to obtain assistance with the exportation of U.S.-origin aircraft, specifically Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 to Iran.

    b.    In or around 2006, defendants **ARABNEJAD, MAHMOUDI** and **MOATTAR** caused defendant **MAHAN AIR** to loan Balli Aviation, through its subsidiaries the Blue Sky Companies, approximately $140 million (U.S. dollars), to purchase Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 through a United Arab Emirates company, Blue Sky Aviation FZE.

    c.    In or around September 2006, defendants **ARABNEJAD, MAHMOUDI** and **MOATTAR,** representing defendant **MAHAN AIR**, caused Balli Aviation, through Balli Aviation's subsidiaries, the Blue Sky Companies, to purchase Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 on behalf of defendant **MAHAN AIR**.

    d.    In or around October 2006, defendants **ARABNEJAD, MAHMOUDI** and **MOATTAR,** representing defendant **MAHAN AIR**, caused Balli Aviation, through Balli Aviation's subsidiaries, the Blue Sky Companies, to enter into separate lease agreements with Blue Airways for one-year leases of Boeing Aircraft 1, Boeing

Aircraft 2, and Boeing Aircraft 3. No payments were ever made under these lease agreements.

e. As early as in or around December 2006, defendant **MAHAN AIR**, having obtained through its front company, Blue Airways, use of Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3, repainted the aircraft with defendant **MAHAN AIR** colors and name, and began using these aircraft on regular flights in and out of Tehran, Iran.

f. In or around November 2007, defendant **MAHAN AIR,** through co-conspirators both known and unknown to the Grand Jury, caused Balli Aviation to extend the lease arrangements with its front company, Blue Airways, that allowed defendant **MAHAN AIR** to continue to utilize Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 for another year.

g. Between in or around January 2008 through March 2008, defendant **MAHAN AIR** advanced money to Balli Aviation in an effort to obtain Boeing Aircraft 4, Boeing Aircraft 5, and Boeing Aircraft 6, totaling approximately $67 million dollars (U.S. dollars).

h. In or around August 2008, despite the prohibitions of the TDO, which was served on Mahan Air, defendant **MOATTAR**, on behalf of defendant **MAHAN AIR**, met with representatives of an airline in Iceland to discuss a possible partnership involving the ownership and operation of Boeing Aircraft 4, Boeing Aircraft 5, and Boeing Aircraft 6.

i. On or about October 13, 2008, defendant **ARABNEJAD**, on behalf of defendant **MAHAN AIR**, caused copies of Bills of Sale to be fraudulently created in an

attempt to obtain clear title to Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3.

j.  In or around October 2008, defendant **MAHMOUDI**, on behalf of defendant **MAHAN AIR,** used the newly created bills of sale to register Boeing Aircraft 1, Boeing Aircraft 2, and Boeing Aircraft 3 in Iran.

(**Conspiracy to Unlawfully Export and to Defraud the United States by Dishonest Means**, in violation of 18 U.S.C. § 371)

## COUNT TWO
### (Willful Violation of Denial Order)

23. The allegations in Paragraphs 1 through 19 are hereby realleged as if fully set forth herein and are incorporated by reference.

24. Notwithstanding the prohibitions of a denial order, pursuant to the EAR, the defendants **MAHAN AIR**, **MOATTAR** and **MAHMOUDI**, could export items from the United States by obtaining prior approval from the Office of Exporter Services of the Department of Commerce.  15 C.F.R § 764.3(a)(2).

25. Starting in or around March 2008 and continuing through in or about August 2008, within the District of Columbia and elsewhere, defendants **MAHAN AIR**, **MOATTAR** and **MAHMOUDI**, willfully violated a denial order issued by the Department of Commerce, located in the District of Columbia, without having first obtained the required approval from the Department of Commerce, by carrying on negotiations with others concerning buying, receiving, using, selling, and delivering Boeing 747s, which were U.S.-origin aircraft subject to the EAR.

(**Willful Violation of Denial Order**, in violation of Title 50, United States Code, Section 1705, and Title 15, Code of Federal Regulations, Section 764.2(a), (b), (k); **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2.)

**FORFEITURE ALLEGATION**

26.     The violations alleged in Counts One and Two of this Indictment are re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

27.     As a result of the offenses alleged in Counts One and Two of this Indictment, defendants shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offenses alleged in Count One through Count Two, including, but not limited to:

Money Judgment:

judgment in favor of the United States for a sum of money equal to the value of the property constituting or derived from, any and all proceeds the defendants obtained, directly or indirectly, as a result of the offenses alleged in Counts One and Two of this Indictment.

By virtue of the commission of the felony offenses charged in Counts One and Two of this Indictment, any and all interest that defendants have in property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offenses is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

28.     If, as a result of any act or omission of the defendants, the property identified above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating by reference Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the said defendants up to the value of said property listed above as being subject to forfeiture.

(**Criminal Forfeiture**, in violation of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia